**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| IN RE: ESTATE OF PETER J. CARUSO, III | : | No. 14 WAP 2023 |
| GERALDINE CARUSO | : | |
| | : | Appeal from the Order of the |
| | : | Superior Court entered November |
| v. | : | 15, 2022, at No. 1406 WDA 2021, |
| | : | affirming the Order of the Court of |
| | : | Common Pleas of Allegheny County |
| SANDRA CARUSO, EXECUTRIX OF THE | : | entered October 28, 2021, at No. |
| ESTATE OF PETER J. CARUSO, III | : | 3623-2015. |
| | : | |
| | : | ARGUED: April 9, 2024 |
| APPEAL OF: SANDRA A. CARUSO | : | |

**OPINION**

**CHIEF JUSTICE TODD**                    **DECIDED: SEPTEMBER 11, 2024**

In this appeal by allowance, we consider whether an individual – here, the spouse of a deceased business partner – who was not an original party to a partnership agreement, nor a third-party beneficiary of that agreement, and where the terms of the agreement do not permit assignment of a deceased partner's interest to a non-party, may be permitted to "step into the shoes" of the deceased partner and enforce the partnership agreement. We conclude such an individual may not, and so reverse the order of the Superior Court.

**I. Facts and Procedural History**

On December 12, 1983, Mary Ann Caruso and her two adult sons, Peter and John, executed a partnership agreement ("Partnership Agreement") forming a general partnership to function under the registered fictitious name of "Hays Land Company"

("HLC") and engage in "the purchase and development of property/land holdings." Trial Court Opinion, 1/26/22, at 2. Thereafter, Mary Ann, Peter, and John operated HLC together and, by 1997, HLC had acquired nine parcels of real estate in Allegheny County.

In 1997, Mary Ann conveyed her interest in the partnership to Peter and John in equal shares, and she passed away later that year. Peter and John continued to jointly conduct HLC's real estate business for six more years until 2003, when John died. John was survived by his wife, Geraldine, who is the appellee in this matter.[1]

The Partnership Agreement included Paragraph 14, entitled "Buy-Sell on Death of Partner":

> If the Partnership is dissolved by the death of a Partner, the remaining Partners shall have the obligation within 90 days from the date of death of the deceased Partner to purchase the interest of the deceased Partner in the Partnership and to pay to the personal representative of such deceased Partner the value thereof as provided in Paragraph 13 of this Agreement.[2] During such 90-day period following the death of a Partner, the remaining Partners may continue the business of the Partnership but the estate or personal representative of the deceased Partner shall not be liable for any obligations incurred in the Partnership business beyond the amount includable in the estate of the deceased Partner already invested or involved in the Partnership on the date of

---

[1] Upon John's death, Geraldine became the executrix of his estate which was ultimately settled and closed in 2006 in a separate proceeding in the Orphans' Court of Allegheny County. *See Estate of John D. Caruso*, No. 2909 of 2003 (Allegheny Cnty. Common Pleas) ("*In re Estate of Caruso*").

[2] Paragraph 13 of the Partnership Agreement provides that the value of the interest of the deceased Partner would be calculated in accordance with its "net book value." Partnership Agreement, 12/12/83, at ¶13 (R.R. at 422a). As a general matter, the "net book value" of an asset is its value as recorded in a business entity's accounting records, and it is determined by calculating the difference in value between the original cost of the asset, minus any impairment to its value caused by things such as accumulated depreciation or depletion. It is therefore not always equal to the market value of the asset at a given point in time, which may be higher or lower. *See* "net book value", Oxford Dictionary of Accounting (5th ed. 2016) 304; *see also* https://www.accountingtools.com/articles/net-book-value.

the deceased Partner's death. The estate of the deceased Partner shall be obligated to sell as provided herein and shall be entitled, at the election of the personal representative of the deceased Partner, to either [a calculation of profits or interest from the 90-day partnership wind-up period].

Partnership Agreement, 12/12/83, at ¶14 (R.R. at 423a) ("buy-out provision").

The sole surviving partner, Peter, did not exercise this buy-out provision following John's death, nor did Geraldine, as executrix of John's estate, attempt to enforce it at that time. Instead, Peter continued to operate HLC until 2015. During that time period, Geraldine and Peter equally owned 50% of the shares of HLC, and Geraldine received 50% of the distributions of the proceeds from HLC's real estate business. *In re Estate of Peter J. Caruso, III, Geraldine Caruso v. Sandra Caruso, Executrix of the Estate of Peter J. Caruso*, No. 3623 of 2015 (Allegheny Cnty. Common Pleas) ("*Estate of Caruso v. Executrix*"), Joint Stipulations of Fact, 1/31/22, at ¶21 (R.R. at 410a); *In re Estate of Caruso*, Settlement Agreement, 5/26/06, at 3 (R.R. at 662a); Trial Court Opinion, 1/26/22, at 3.

Geraldine, however, became dissatisfied with the level of involvement Peter allowed her in the day-to-day business operations of HLC, and, as a result, in 2013, she commenced an action in equity in the Court of Common Pleas of Allegheny County against Peter and HLC, seeking a formal accounting and monetary damages, as well as an injunction enjoining Peter and HLC from excluding her from "meaningful participation in the business of and management of the Partnership," and compelling them to provide to her "equal right in the management of the Partnership and the conduct of the Partnership business." *See Geraldine Caruso v. Peter Caruso III*, G.D. 13-6302 (Allegheny Cnty. Common Pleas) ("2013 Case"), Complaint, 4/10/13, at 10 (R.R. at 686a). Peter filed a timely answer to this complaint on behalf of himself and HLC, portions of which, as discussed further herein, have relevance to the instant matter.[3]

---

[3] The 2013 Case was ultimately dismissed for inactivity on December 12, 2016.

On April 30, 2015, Peter executed documents that merged HLC with a newly-established limited liability company, Hays Land Company-Pittsburgh, LLC ("HLC-PGH"). Trial Court Opinion, 1/26/22, at 3. One of the purported objectives of the merger was to insulate the partners from personal liability for debts and any legal actions that might be filed against the partnership. Peter signed the merger documents in his dual capacity as the managing partner of business affairs for HLC and as a member of HLC-PGH. The documents Peter executed included a "Joint Written Consent of Partner and Member in Lieu of Meeting." *Id.*

Peter died in May 2015, and he was survived by his daughter, Sandra, who is the executrix of Peter's estate and the appellant herein ("Sandra"). Shortly after his death, Geraldine attempted to exercise the Partnership Agreement's above-referenced buy-out provision by tendering a check to Sandra in the amount of $117,762.50, the net book value of Peter's partnership share. *In re Estate of Caruso*, 176 A.3d 346, 348 (Pa. Super. 2017) ("*Caruso I*"). Sandra refused to accept the offer, asserting that the Partnership Agreement was not in effect at the time Peter died because the partnership had ended upon John's death in 2003. *Id.*

In October 2015, Geraldine, acting in her own individual capacity, commenced the instant litigation in the Allegheny County Court of Common Pleas against Sandra, seeking a declaratory judgment that the Partnership Agreement still governed her business relationship with Peter at the time of his death, that the 2015 merger with HLC-PGH was invalid, and requesting that the court order specific performance of the buy-out provision of the Partnership Agreement by compelling Sandra to convey Peter's partnership interest to her.[4] The trial court, by the Honorable Kathleen Durkin, ultimately entered summary

---

[4] Even though this case was brought by Geraldine in her own behalf, because Geraldine was seeking to enforce the provision of the Partnership Agreement purportedly requiring Peter to sell to her his interest in the partnership, the case was subsequently transferred (continued…)

judgment in favor of Sandra on these claims, holding that the "Dead Man's Act"[5] precluded Geraldine from providing oral testimony as to her business dealings with Peter prior to his death; hence, the trial court reasoned that she could not prove that it was their mutual intent to continue to be governed by the Partnership Agreement in the conduct of the business affairs of HLC, or that the 2015 merger was invalid. *Id.*

Geraldine appealed that decision to the Superior Court, which reversed. *Caruso I*. That tribunal found that there existed other sufficient competent evidence of record not barred by the Dead Man's Act which presented "numerous factual and legal issues surrounding the validity of the purported merger"; thus, it determined that Sandra had not established her right to judgment on this question as a matter of law. *Caruso I*, 176 A.3d at 351-52.

With respect to the issue of whether the Partnership Agreement governed Geraldine and Peter's business relationship following John's death, the Superior Court

---

to the Allegheny County Orphans' Court Division pursuant to a joint motion of the parties, based on 20 Pa.C.S. § 711(13) (granting orphans' court division of the court of common pleas jurisdiction "[t]o enforce specifically the performance by either party of any agreement made by a decedent to purchase or sell real or personal property"). *Geraldine Caruso v. Sandra Caruso*, GD-15-017564 (Allegheny Cnty. Common Pleas), Joint Motion to Transfer, 11/30/15. Upon transfer to the Orphans' Court Division, this case was given its caption in the case we have denominated *Estate of Caruso v. Executrix*.

[5] 42 Pa.C.S. § 5930. As our Court has explained, the Dead Man's Act

> provides an exception to the general rule of competency and disqualifies surviving parties to a transaction or event who have an interest adverse to the decedent from testifying as to matters which occurred prior to the decedent's death. The purpose of the Act is to prevent the injustice which might flow from permitting the surviving party to a transaction with a decedent to give testimony thereon favorable to himself and adverse to the decedent, which the latter's representative would be in no position to refute. The Act accomplishes this purpose and aids the estate by making the witness incompetent to testify to such matters.

*Estate of Kofsky*, 409 A.2d 1358, 1359 (Pa. 1979) (internal citations and quotation marks omitted).

found that Geraldine had demonstrated the existence of a genuine issue of material fact as to whether they had intended to be governed by that instrument. The court first noted that the fact that Peter had not exercised the buy-out provision on John's death was, in its view, "compelling evidence that the parties intended to continue the partnership." *Id.* at 354. Further, the court found that other evidence presented by Geraldine buttressed this inference, such as purported admissions by Peter in the 2013 Case that he and Geraldine were partners in HLC – which was the same partnership that had been formed by the Partnership Agreement[6] – and the fact that Peter continued to prepare, sign, and submit the same partnership income tax returns for HLC after John's death, using the same federal employer identification number originally issued to HLC, but which reflected income generated by the partnership paid to Geraldine. Consequently, the Superior Court remanded this case to the trial court for further proceedings.

After remand, the matter was assigned to the Honorable Michael McCarthy who ordered the submission of documentary evidence and briefing by the parties on the question of whether Geraldine was entitled to specific performance, and he heard argument on this issue in August 2021. Thereafter, on October 26, 2021, the trial court entered an order in which it found that the Partnership Agreement survived the death of Peter and, thus, remained the governing document for HLC, and it granted Geraldine's request for specific performance of its buy-out provision.

---

[6] In the 2013 Case, Geraldine attached the Partnership Agreement to her complaint, and she averred that it is "the Partnership Agreement for Defendant Hays Land Company." *See* 2013 Case, Complaint, 4/10/13, at 3 ¶19 (R.R. at 679a). In his answer, Peter responded as follows: "Paragraph 19 of Plaintiff's Complaint refers to a written document which speaks for itself. To the extent that a response is deemed necessary, Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 of Plaintiff's Complaint. *Therefore, the allegations contained in said Paragraph are denied as stated* and strict proof thereof is demanded at the time of trial." 2013 Case, Answer, 8/27/13, at 4 ¶19 (R.R. at 703a) (emphasis added).

In a subsequent opinion, authored pursuant to Pa.R.A.P. 1925(a), the trial court interpreted Paragraph 14 of the Partnership Agreement, quoted above, not to dictate automatic dissolution of the partnership upon the death of a partner, but, rather, to apply only in the event that the partnership was affirmatively dissolved after a partner's death. In the trial court's view, the fact that there was no affirmative action taken by Peter at the time of John's death to dissolve the partnership, coupled with Peter's subsequent dealings with Geraldine, furnished sufficient evidence to conclude that there was an agreement by Peter and Geraldine to continue the existence of the partnership under the terms of the Partnership Agreement. The court cited, as evidence of this implied agreement, the fact that the partnership tax returns from 2003 onward identified the HLC partners as Peter and Geraldine, and that there was no evidence of any operational change in the partnership following John's death, except that Geraldine was now participating in the partnership with Peter. Trial Court Opinion, 1/26/22, at 6.

The court rejected Sandra's arguments that it would be error to find "that Geraldine stepped into the shoes of John as a party to the 1983 Partnership Agreement, that the agreement survived the death of Peter, or that Peter intended to provide Geraldine rights under the 1983 agreement." *Id.* The court found that, even though Geraldine did not sign the Partnership Agreement, it was nevertheless binding because:

> it reasonably appeared to Geraldine that the actions of Peter and the operations of [HLC] following John's death remained substantially unaltered. Geraldine has averred, credibly, that she reasonably relied upon that unaltered pattern and has argued, convincingly, that representations such as those consistently appearing on tax returns in years subsequent to John's death that the partnership had not dissolved provide further proof that the partnership endured.

*Id.* at 6-7.

On appeal to the Superior Court, Sandra challenged the trial court's determination that the Partnership Agreement governed, arguing that: Geraldine never signed the 1983 Partnership Agreement; there was no evidence that Geraldine and Peter entered into an oral or written agreement for Geraldine to become a party to the Partnership Agreement; there was no Pennsylvania authority allowing a person to "step into the shoes" of a signatory to a partnership agreement, as Geraldine claimed she had done upon John's death; and Geraldine failed to provide evidence of an offer, mutual assent, and consideration between her and Peter in support of her claim that she became a *de facto* partner after John's death.

The Superior Court affirmed the trial court's decision in a unanimous unpublished memorandum opinion. *In re Estate of Caruso*, 289 A.3d 70, 2022 WL 16943284 (Pa. Super. filed Nov. 15, 2022) ("*Caruso II*").[7] The court observed that, under Pennsylvania's Uniform Partnership Act ("UPA"),[8] the issue of whether a partnership exists depends upon whether the parties intend to be partners, but a formal written agreement to establish a partnership is not required. *Id.* at *4 (citing *Murphy v. Burke*, 311 A.2d 904 (Pa. 1973) (holding that no formal written agreement is necessary for a partnership to be formed)). It further noted that a partnership may be found to exist by implication from the circumstances and manner in which business was conducted among individuals. *Id.* (citing *DeMarchis v. D'Amico*, 637 A.2d 1029 (Pa. Super. 1994)). Additionally, the court

---

[7] This memorandum opinion was authored by Judge Maria McLaughlin and joined by Judges Victor Stabile and Mary Murray.

[8] At the time this litigation began, a prior version of the UPA, 15 Pa.C.S. §§ 8301-8365, was in effect. That version was repealed on February 21, 2017 and replaced with 15 Pa.C.S. §§ 8411-8486. *See* Act of Nov. 21, 2016, No. 170 (effective Feb. 21, 2017-Jan. 2, 2023). Subsequently, the legislature enacted further amendments to the UPA, which took effect on January 3, 2023. *See* Act of Nov. 3, 2022, No. 122 (effective Jan. 3, 2023). The current version of the UPA applies to all partnerships, subject to one exception not herein applicable. *See* 15 Pa.C.S. § 8411(d).

highlighted the principle that "a partnership may continue, even upon the death of a partner, if an agreement exists between the partners to continue," *id.* (quoting *Underdown v. Underdown*, 124 A. 159, 161-62 (Pa. 1924)), and that an "agreement not to dissolve the partnership can be made by the deceased partner's legal representative," *id.* (quoting 13 Summ. Pa. Jur. 2d Business Relationships § 16:14. (2d ed.)) (internal quotation marks omitted).

Ultimately, the Superior Court determined that the pattern of conduct between Geraldine and Peter following John's death established that Geraldine "stepped into the shoes" of John with respect to HLC. *Id.* The court found that the continuing existence of the partnership was established by evidence showing that Peter failed to exercise his buy-out option on John's death, continued to operate HLC together with Geraldine, and signed tax returns of the partnership for the time period 1998-2014 using the same federal employer number for HLC that was issued when it was formed. Additionally, the court considered Peter's purported admission in the 2013 Case that he and Geraldine were partners in HLC to be "unequivocal evidence that the parties believed that the 1983 Partnership Agreement remained in effect." *Id.* The court remarked that "the trial court specifically noted that Geraldine testified credibly that she relied on Peter's pattern of conduct to believe that HLC and the 1983 Partnership Agreement endured." *Id.* at *4.[9]

With respect to the trial court's order of specific performance of the buy-out provision, the Superior Court found no error by the trial judge in granting this remedy, concluding that, once the court determined that the Partnership Agreement was controlling and enforceable, the only accurate way to assess Geraldine's damages was to order specific performance of its buy-out provision. *Id.* at *6.

---

[9] Our independent review of the record discloses that the trial court received no testimony from Geraldine at the August 2021 hearing.

Thereafter, Sandra filed a petition for allowance of appeal with our Court challenging the Superior Court's decision, which we granted to consider the question of whether an individual, who is not an original party to a partnership agreement, nor a third-party beneficiary of it, and where the terms of the agreement do not permit assignment of a partner's interest to a non-party, may be permitted to "step into the shoes" of a party to the agreement and, thus, to enforce the contractual rights conferred on that party by the agreement. *In Re Estate of Caruso*, 303 A.3d 704 (Pa. 2023) (order).

## II. Arguments of the Parties

Sandra highlights that the Partnership Agreement is a contract, and, thus, must be interpreted in accordance with the principles of Pennsylvania law that govern all other contracts. Sandra reminds that Pennsylvania, like all other states, adheres to the view that the primary public policy consideration undergirding our contract law is to fulfill the bargained-for expectations of parties who enter into a contract. Sandra argues that permitting a stranger to a contract – *i.e.*, a non-party to the contract who is not a third-party beneficiary of the contract, or an assignee of the rights of a contracting party – to "step into the shoes" of a party to that contract, or to assert the same rights of the parties to the contract, would contravene that principle by undermining the settled expectations of the contracting parties. This would, in turn, cast doubt on the stability, reliability, and predictability of contracts as a general matter. Appellant Brief at 28.

Sandra stresses that it is a fundamental precept of contract law in our Commonwealth that only those who are parties to a contract – in "contractual privity" – have a legal interest which they can enforce. *Id.* at 30. Thus, Sandra asserts that an individual seeking to enforce a contract must first establish the existence of a contract to which the individual was a party, which means proving that all of the formal requisites of contract formation have been met: offer, acceptance, and consideration. Sandra argues

that Geraldine was not entitled to enforce the buy-out provision contained in the Partnership Agreement – which enables her to purchase Peter's interest at net book value rather than paying market value – because she was not a party to the Partnership Agreement, which was executed in 1983, given that she never signed it, and never exchanged any consideration with the parties to that contract.

Likewise, Sandra notes that Geraldine never executed any writing with the surviving partner, Peter, amending or modifying the Partnership Agreement to make her a party to it, nor is there any other evidence establishing that there was the requisite offer, acceptance, and consideration exchanged between herself and Peter by which she became a party to that agreement. Indeed, Sandra highlights that the agreement contained no mechanism by which new parties could be admitted to the partnership. Consequently, Sandra avers that, because Geraldine could not establish the requisite contractual privity with either the original partners or Peter, she has no right to enforce the Partnership Agreement.

Sandra acknowledges that under Pennsylvania law there are two limited exceptions to this privity requirement under which an individual who is not a party to a contract may, nevertheless, enforce it: where the individual has been assigned a party's rights under a contract, or where the individual is a third-party beneficiary of the contract. Sandra contends that neither of these exceptions apply in the present case.

With respect to the first exception, Sandra points out that the Partnership Agreement itself contained no provision or mechanism by which a partner's rights could be assigned to another individual. Further, Sandra asserts that Geraldine did not claim to have received an assignment of John's partnership interest, and there is simply no evidence of record which indicated that John or Peter otherwise made an assignment of their partnership interest to Geraldine at any point in time.

Regarding the second exception, Sandra highlights that, under the plain terms of the Partnership Agreement, Geraldine was not a third-party beneficiary. Sandra points out that neither Geraldine, as John's spouse, nor Peter's spouse Margaret, were mentioned at all in the Partnership Agreement, or "otherwise mentioned by name, familial role, or potential heir status." *Id.* at 56. In fact, according to Sandra, as a general matter, "[t]he agreement makes no mention of heirs or legal representatives and does not indicate that it binds, or inures to the benefit of, the heirs, successors, or assigns of any partner." *Id.*

Sandra maintains that the Superior Court's determination that Geraldine "stepp[ed] into the shoes" of her husband John and acquired the same rights as if she were a party to the Partnership Agreement disregards these well-established principles of contract law, and "eviscerates the original contracting parties' settled expectations and undermines the predictability and reliability of the agreement that they—and they alone—formed." *Id.* at 45. Sandra submits that the Superior Court's conclusion derives no legal support from our Court's caselaw, given that we have recognized a right of an individual who is not a party to a contract to step into the shoes of a contracting party and assert their rights *only* in situations when the contracting party has assigned those rights to that individual. *See id.* at 40 (citing *Gray v. Nationwide*, 223 A.2d 8, 13 (Pa. 1966) (recognizing that, when an insured party assigns a claim against his insurance company for a bad faith failure to pay a personal injury judgment to the injured party, the injured party then "stands in the shoes of the insured" in pursuing that particular claim); *Hedlund Manufacturing v. Weiser, Stapler and Spivak*, 539 A.2d 357, 358 (Pa. 1988) (allowing a third party who was assigned client's legal malpractice claim against an attorney to pursue the claim despite the absence of a contractual relationship by the third party with the attorney, due to the fact that "the assignee stands in the shoes of the assignor and does not pursue the cause

of action in the assignee's own right"); *Crawford Central School District v. Commonwealth*, 888 A.2d 616, 622 (Pa. 2005) (where school district was assigned contractor's right to receive sales tax refunds on materials purchased for renovations, school district, as assignee of this right, "stands in the shoes" of the contractor; thus, because contractor was not entitled to a sales tax refund on the items purchased, neither was school district)).  Sandra reiterates that no such assignment to Geraldine was made in this case.

Sandra further asserts that decisions from the high courts of several of our sister jurisdictions support her position that individuals who are not parties to a contract cannot become a party to a contract by stepping into the shoes of an original party to that contract unless there has been an assignment by the original party of his or her rights under the contract, unless the individual is a third-party beneficiary of the contract, or unless the individual has subrogation rights derivative of the rights of the original party.  *Id.* 42-45 (citing *Centerplan Construction Company v. City of Hartford*, 274 A.3d 51, 75 (Conn. 2022); *Dreyer-Whitehead & Goedecke v. Land*, 216 S.W. 2d 413, 414 (Ky. 1948); *Standard Accident v. Pellecchia*, 104 A.2d 288, 302 (N.J. 1954); *Kunzman v. Thorsen*, 740 P.2d 754, 759 (Or. 1987); *Silverman v. Dew*, 189 S.E. 756, 757 (S.C. 1937); *Columbia Community Bank v. Newman Park L.L.C*, 304 P.3d 472, 473 (Wash. 2013); *Muller v. Society Insurance*, 750 N.W.2d 1, 6 (Wis. 2008)).

Sandra claims that, in concluding that Geraldine stood in John's shoes and could enforce his buy-out rights under the Partnership Agreement, the Superior Court disregarded an earlier decision of that tribunal, *Gallagher v. Hearthside Realty*, No. 3699 EDA 2018, 2019 WL 4273792 (Pa. Super. filed Sept. 9, 2019), which reached the opposite conclusion under factually similar circumstances.  Therein, the Superior Court refused to allow the children of a party to a partnership agreement to enforce an arbitration

clause against the other partner to the agreement, given that the children had no contractual relationship with the partner, and given the absence of any evidence of an offer, acceptance, and consideration necessary to create such a relationship.

Sandra additionally challenges the Superior Court's reliance on *Murphy* and *DeMarchis*, alleging that neither case supports the court's finding that a course of conduct, or the implied circumstances of a business relationship, can establish a manifestation of mutual assent to be bound by the *terms* of a pre-existing agreement. She suggests that the lower court conflated "the business of the partnership with the partnership entity itself." Appellant Brief at 48 (emphasis added).

Sandra also disputes Geraldine's assertion that Peter made an admission in the 2013 Case that the Partnership Agreement governed his business relationship with Geraldine while they were acting together to operate HLC. To the contrary, Sandra emphasizes that, in the answer Peter filed in that case, he specifically *denied* an allegation by Geraldine that the Partnership Agreement was the Partnership Agreement for HLC during that time. *Id.* at 49; *see also supra* note 6.

In response, Geraldine argues that the Superior Court properly found that the conduct of Peter and Geraldine, after John's death, indicated that they intended to continue HLC as partners who were bound by the Partnership Agreement. Geraldine argues that, as our Court recognized in *Murphy*, and the Superior Court acknowledged in *DeMarchis*, the concept of "partnership by conduct was an accepted theory of partnership"; thus, she reasons the conduct of parties can be used to establish that they intend to have their partnership arrangement governed by a preexisting partnership agreement. Appellee Brief at 20.

Geraldine contends that there is no sweeping general rule established by our prior cases or the cases from other jurisdictions cited by Sandra barring a non-party from

enforcing a partnership agreement. She distinguishes those cases as "inapposite" and "irrelevant" to this case, given that many involve an attempt to enforce a contractual obligation against a non-party. *Id.* at 22. Geraldine adds that the Superior Court decision in *Gallagher* is non-precedential and, in any event, inapplicable, because it did not concern enforcement of a partnership agreement based on a course of conduct.

To the contrary, Geraldine observes that, in *Kilpatrick Estate*, 84 A.2d 339, 341 (Pa. 1951), our Court held that a personal representative of a deceased party stands in the shoes of the decedent, and she claims that Sandra does not dispute that Geraldine is John's personal representative; by virtue of this status, Geraldine avers that she "stands in the shoes" of John with respect to his interest in the Partnership Agreement. Appellee Brief at 30.

In response to the litany of cases cited by Sandra for the proposition that a non-party cannot stand in the shoes of a party to a contract, Geraldine argues that these cases are also factually inapposite, and, therefore, of no precedential value in the resolution of this question.

Finally, Geraldine avers that public policy warrants a finding in her favor, based on her claim that both she and Peter believed and understood that she was a partner under the Partnership Agreement. In Geraldine's view, the evidence of record, rather than establishing that Geraldine and Peter formed a new partnership after John's death, instead showed that they continued to operate the partnership under the terms of the Partnership Agreement until April 2015. Specifically, Geraldine contends that the fact that Peter did not execute the buy-out provision upon John's death knowing it would dissolve the partnership constitutes, as the Superior Court characterized it in *Caruso I*, "powerful evidence of the parties' intent to continue the HLC Partnership." *Id.* at 19 n.5 (quoting *Caruso I*, 176 A.3d at 354). Geraldine also characterizes certain admissions by

Peter made in his answer to Geraldine's complaint as providing "conclusive evidence" that Geraldine and Peter continued the original HLC Partnership after John's death. *Id. at* 5. Geraldine emphasizes that Peter admitted that: "Defendant, Hays Land Company, a Pennsylvania general partnership, is comprised of two partners;" and "the current partners of Defendant Hays Land Company are Geraldine Caruso, with a fifty (50%) percent interest and Peter J. Caruso, III with a fifty (50%) percent interest." *Id.* at 6 (quoting 2013 Case, Complaint, 4/10/13, at 1 ¶¶3-4, 3 ¶18 (R.R. at 677a, 679a); 2013 Case, Answer, 8/27/13, at 1 ¶¶3-4, 4 ¶18 (R.R. at 700a, 703a)). Geraldine adds that her shared 50% interest in the partnership after John's death was confirmed by HLC's accountant in a deposition taken in this matter.

Geraldine avers additional proof that the Partnership Agreement governed Geraldine's business relationship was the fact that HLC was formed in 1979 and used the same employer identification number ("EIN") for more than 30 years thereafter, and, as the trial court found, there were no operational or structural changes in the HLC partnership after John's death — except that Geraldine was, from that point forward, participating in the operation of the partnership.

### III. Analysis

In this case, we are reviewing the trial court's grant of specific performance. Specific performance of contractual provisions "is an equitable remedy [which is] not available as a matter of course but only in unique situations." *Pugh v. Holmes*, 405 A.2d 897, 908 (Pa. 1979). Appellate review of the decree of a trial court granting such extraordinary equitable relief "is limited to a determination of whether the chancellor committed an error of law or abused his discretion." *T.W. Phillips Gas and Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012). Although "facts found by the chancellor, when supported by competent evidence in the record, are binding, no such deference is

required for conclusions of law, which we review *de novo.*" *Id.* Additionally, a reviewing court is not bound by factual findings of the chancellor which are "without support in the record or have merely been derived from other facts." *Zitelli v. Dermatology Educ. and Research Foundation*, 633 A.2d 134, 137 (Pa. 1993) (quoting *Frowen v. Blank*, 425 A.2d 412, 415 (Pa. 1981)).

It is a foundational principle of our law that, in order for a court to compel specific performance of a contractual provision, the party seeking such relief must demonstrate the existence of contract between the parties containing that provision. As our Court stated over a half century ago:

> A court of equity will not enforce a contract, unless it is complete and certain in all its essential elements. The parties themselves must agree upon the material and necessary details of the bargain, and if any of these be omitted, or left obscure or indefinite, so as to leave the intention of the parties uncertain respecting the substantial terms of the contract, the case is not one for specific performance.

*Berberich v. Berberich*, 118 A.2d 445, 448 (Pa. 1955); *see also Peck v. Delaware County Board of Prison Inspectors*, 814 A.2d 185, 191 (Pa. 2002) ("It is basic contract law that for there to be an enforceable contract, the parties themselves must agree upon the material and necessary details of the bargain." (citation and internal quotation omitted)); 25 Williston on Contracts § 67:2 (4th ed.) ("[I]n an action for the specific performance of a contract, the first requirement is the existence of a valid, legally enforceable contract."). Moreover, "[a] decree of specific performance is a matter of grace and not of right." *Clark v. Pennsylvania State Police*, 436 A.2d 1383, 1385 (Pa. 1981). Consequently, "specific performance should only be granted where the facts clearly establish the plaintiff's right thereto, where [an] adequate remedy at law does not exist, and where justice requires it." *Cimina v. Bronich*, 537 A.2d 1355, 1358 (Pa. 1988).

Generally, in order for a contract to be formed, there must be three requisite elements: an offer, acceptance, and consideration. *Muhammad v. Strassburger, McKenna, Messer, Shilobod and Gutnick*, 587 A.2d 1346, 1349 (Pa. 1991). Plainly, in the instant case, none of these essential prerequisites were met with respect to Geraldine and the original parties to the Partnership Agreement. Rather, the agreement, with its multifarious provisions governing all aspects of the partnership formed to operate HLC, was made between Peter, John, and their mother alone; thus, its provisions, including its buy-out provision in Paragraph 14, were binding and enforceable as between those parties exclusively.

Notably absent from the Partnership Agreement was any successor provision which conferred on the spouses, heirs, or legal representatives of any party to that agreement the power, upon the death of the party, to assume and exercise the party's rights thereunder. Although Peter and John's mother subsequently assigned her partnership rights to them in equal shares prior to her death, there was no evidence that John or Peter made any assignment of their partnership rights under the Partnership Agreement to Geraldine – either during their lifetimes, or as a testamentary disposition upon their deaths – which would support the lower courts' finding that Geraldine now stands in the shoes of John so as to enforce his rights under the agreement.

*In re Kilpatrick's Estate*, relied on by Geraldine, does not suggest a different conclusion. In that case, an individual who was the second husband of his deceased wife attempted to compel the orphans' court to review the administration of his wife's estate bequeathed to her under the will of her first husband, even though the second husband was not an administrator of her estate under that will, nor a beneficiary of that testamentary instrument. In upholding the orphans' court decision denying the second husband's petition for intervention, our Court reaffirmed the general rule "that one having

no direct interest in an estate cannot demand an account, or, when an account is filed, interfer[e] in its settlement or in any proceeding based upon it." 84 A.2d at 340. We additionally underscored that "only the *personal representative* of a deceased party in interest stands in the shoes of such decedent." *Id.* at 341 (emphasis original).

As related above, Geraldine claims this language supports the broad proposition that, because she was the personal representative of John, she stands in his shoes with respect to all of his legal rights, including those under the Partnership Agreement. Such an expansive interpretation of *In re Kilpatrick's Estate* is not justified, as we held only that personal representatives "stand in the shoes" of a decedent to initiate proceedings in orphans' court *involving the administration of the decedent's estate*. Our holding was issued within that context and cannot be extended in the manner Geraldine suggests. To do so would improperly conflate the broad statutory powers a personal representative to settle a decedent's estate, *see generally* 20 Pa.C.S. §§ 3311-3332, with the personal representative's own individual private contractual rights, which he or she acquires only if the necessary prerequisites of contract formation — offer, acceptance and consideration — have been met.

At any rate, this case was brought by Geraldine *in her own capacity* to enforce what she claims are *her* rights under the Partnership Agreement; it was not brought in her capacity as the executrix of John's estate – which was closed in 2006, long before the instant suit.[10] Her former status as executrix of that estate does not, in and of itself, permit her to enforce his rights under the Partnership Agreement.

Finally, there was no evidence that Geraldine was a third-party beneficiary under the Partnership Agreement. In order for a non-contracting party to attain third-party beneficiary status under an agreement: "(1) the recognition of the beneficiary's right must

---

[10] *See supra* note 1.

be appropriate to effectuate the intention of the parties, and (2) the performance must satisfy an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Guy v. Liederbach*, 459 A.2d 744, 751 (Pa. 1983) (internal quotation marks omitted). Geraldine does not meet either of these conditions – nor does she suggest she does – as there was no evidence that the parties to the Partnership Agreement intended to confer on her the benefit of its performance, or that they intended to satisfy any monetary obligation to her.

We thus reject the lower courts' conclusion that Geraldine acquired John's rights under the Partnership Agreement, that she "stepped into his shoes." Our caselaw limits application of that concept, as a matter of general common law contract principles, to situations where a party has been explicitly assigned rights to a contract, *see, e.g.*, *Employer's Insurance of Wausau v. PennDot,* 865 A.2d 825 (Pa. 2005) (insurance company stepped into the shoes of contractor it insured by virtue of contractor's assignment to insurer of its claim for proceeds owed under its contract with PennDot); *Hedlund Manufacturing, supra* (same); *Crawford Central School District, supra* (same), or where the non-party has acquired the right to pursue the party's contractual claims through the equitable doctrine of subrogation, *see, e.g., AAA Mid-Atlantic Ins. Co. v. Ryan*, 84 A.3d 626, 632 n.6 (Pa. 2014) (explaining that "[s]ubrogation is an equitable doctrine intended to place the ultimate burden of a debt upon the party primarily responsible for the loss. *. . .* It allows the subrogee (the insurer) to step into the shoes of the subrogor (the insured) to recover from the party that is primarily liable (the third party tortfeasor) any amounts previously paid by the subrogee to the subrogor" (citation and quotation marks omitted)). These circumstances are not present in the instant case.

In the absence of evidence demonstrating that Geraldine and Peter explicitly agreed to confer upon Geraldine all of the rights John enjoyed under the Partnership Agreement, the lower courts found, as discussed above, that such a contractual relationship could be *implied* from evidence showing that Geraldine and Peter continued to operate HLC as a partnership after John's death. Under the UPA, subject to one exception not applicable to the instant matter, "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership." 15 Pa.C.S. § 8422(a). The formation and existence of a partnership may be demonstrated by evidence surrounding the nature and conduct of parties in their business relationship, and, thus, no written partnership agreement is required to establish the existence of a partnership between the parties. *Murphy, supra*. Consequently, partnership agreements "may be made orally or may be found to exist by implication from all attending circumstances (i.e., the manner in which the alleged partners actually conducted their business, etc.)." 311 A.2d at 907.

Although there was no evidence of any oral or written agreement between Peter and Geraldine regarding the manner in which the business affairs of HLC would be conducted after John's death, the evidence of record showing that Peter and Geraldine continued to carry on the business of HLC after John's death, and shared in the profits thereof, supports the lower courts' conclusion that Peter and Geraldine had formed a partnership with respect to operating HLC after John's death. Critically, however, evidence of this newly-formed partnership, in and of itself, does not establish that they *also* intended that their respective rights and duties under the new partnership would be governed by the terms of the 1983 Partnership Agreement; rather, such intent would also need to be established. *Peck*, 814 A.2d at 191 (for there to be an enforceable contract it

must be established that the parties "agree upon the material and necessary details of the bargain"). We conclude that the evidence did not demonstrate such an intent.

As related above, the lower courts found that the pattern of conduct between Peter and Geraldine demonstrated the existence of a continuing partnership governed by the Partnership Agreement, citing: Peter's failure to exercise his buy-out option on John's death; Peter's continued operation of HLC together with Geraldine; Peter's signing of the partnership tax returns for the years 1998 to 2014 using the same federal employer number for HLC that was issued when HLC was formed; and Peter's purported admission in the 2013 Case that he and Geraldine were partners in HLC.

First, with respect to Peter's failure to exercise the buy-out option of the Partnership Agreement after John's death, the record is silent as to Peter's motivation in doing so. The *absence* of evidence on this point is not proof that he intended the provisions of the Partnership Agreement to govern the new partnership he had formed with Geraldine with respect to HLC. Indeed, the evidence that Peter and Geraldine jointly conducted the business of HLC after John's death, dividing its revenues in accordance with their 50% ownership interests, would suggest an intent to form a superseding partnership for the limited purpose of maintaining HLC and deriving income from it. However, there was no evidence establishing that they intended *any of the provisions of the Partnership Agreement* to govern this superseding partnership.

Regarding Peter's preparation of the partnership tax returns and the continued use of the original EIN number assigned to the partnership after John's death, the accountant for HLC, David Dernar, submitted a sworn affidavit and provided deposition testimony that he did so because federal tax law required a partnership in which at least one partner continued to operate the partnership business continually since its formation to use, on its tax returns, the same partnership start date and EIN number originally assigned to it.

*Estate of Caruso v. Executrix*, Affidavit of David Dernar, Defendant's Trial Exhibit 7, 2/2/22, at 2 (R.R. at 919a); Deposition of David Dernar, Defendant's Trial Exhibit 2, 2/2/22, at 18-24 (R.R. at 819-823a). Further, based on his interactions with Peter, Dernar asserted that Peter had no intention of substituting Geraldine as a partner under the Partnership Agreement after John's death. Dernar Deposition at 43 (R.R. at 844a). Manifestly, this evidence does not show that Peter and Geraldine intended for the Partnership Agreement to govern their operation of HLC as the lower courts found; rather, it tends to establish the *contrary* conclusion.

Lastly, with respect to Peter's purported admissions in his pleadings in the 2013 Case, we observe that admissions "contained in pleadings, stipulations, and the like, are usually termed judicial admissions . . . and as such cannot later be contradicted by the party who has made them. . . . However, it is equally true that such pleadings are conclusive *only in the cause of action in which they are filed*." *Dale Manufacturing Company v. Bressi*, 421 A.2d 653, 655 (Pa. 1980) (quoting *Tops Apparel Manufacturing Company v. Rothman*, 244 A.2d 436 (Pa. 1968)) (emphasis added and internal quotation marks omitted). Thus, to the extent Peter made admissions in the 2013 Case regarding the application of the terms of the Partnership Agreement to the partnership he and Geraldine formed after John's death, such admissions would not definitively resolve the factual question before us. Moreover and critically, however, our review of the pleadings which Geraldine contends contain such admissions compels us to agree with Sandra that Peter did *not* admit that the Partnership Agreement governed his partnership arrangement with Geraldine in operating HLC; rather, he denied that specific allegation in Geraldine's complaint. *See supra* note 6.

In sum, we conclude that the lower courts erred in determining that Geraldine "stepped into the shoes" of John for purposes of enforcing the Partnership Agreement,

either by assignment or otherwise. Furthermore, the courts erred in concluding that Peter and Geraldine agreed to be bound by Paragraph 14 of the Partnership Agreement in forming a new partnership, after John's death, to operate HLC. Accordingly, the trial court erred in directing the specific performance of the buy-out provision in Paragraph 14 against Sandra, and so the order of the Superior Court, affirming the trial court's grant of this remedy, must be reversed.

Order reversed. Jurisdiction relinquished.

Justices Donohue, Dougherty, Wecht, Mundy, Brobson and McCaffery join the opinion.